UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA K. DRINNIN, )
)
Plaintiff, )
)
vs. )        Case No. 4:13-CV-2061 (CEJ)
)
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On October 2, 2006, plaintiff Linda Drinnin filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset date of February 24, 2005. (Tr. 78-83). She listed her disabling conditions as residual pain in her neck, right arm, and right hand following a neck fusion operation in 2005 and carpal tunnel syndrome. She stated that she was unable to work because the pain limited her ability to sit, stand, or walk for more than short periods of time, kept her from lifting anything heavy, and impaired her concentration and memory. (Tr. 107-15). After plaintiff's applications were denied on initial consideration (Tr. 47-53), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 4-5).

Plaintiff and counsel appeared for a hearing on January 24, 2008. (Tr. 23-42). The ALJ issued a decision denying plaintiff's applications on July 16, 2008. (Tr. 9-22). The Appeals Council denied plaintiff's request for review on December 3, 2010. (Tr. 1-3). Plaintiff sought review in this court, Drinnin v. Astrue, 4:11-CV-243 (CEJ), and

on September 10, 2012, the court remanded the matter, based upon a determination that the ALJ improperly relied on the opinion of a non-medical source. [Doc. #16].

On October 15, 2012, the Appeals Council remanded the matter to the ALJ. (Tr. 397). The Council noted that plaintiff was found disabled as of August 1, 2009 -- based on a subsequent application filed on August 3, 2010 -- and instructed the ALJ to consider the additional evidence submitted with the subsequent claim. The Appeals Council noted that the ALJ might wish to obtain the testimony of a medical expert to address the issue of onset of disability prior to August 1, 2009.

Plaintiff and counsel appeared for a second hearing on February 6, 2013. (Tr. 339-55). The ALJ again denied plaintiff's application in a decision issued on June 18, 2013. (Tr. 320-38). The ALJ's second decision stands as the final decision of the commissioner regarding disability prior to August 1, 2009.

## II.  Summary of Prior Medical Evidence

On February 25, 2005, plaintiff was admitted to St. Anthony's Medical Center with complaints of bilateral upper extremity numbness, tingling, pain, and weakness. She had been painting a wall when she felt weakness in her legs. She fell and hit her head. An MRI of the spine showed severe degenerative joint disease at C5-C6, osteophytes, disk complex impinging the anterior thecal sac, and significant neuroforaminal stenosis. The following day, Charles A. Wetherington, M.D., performed a cervical discectomy, nerve root decompression, and fusion at C4-C5, and C5-C6. (Tr. 166-67).

On March 8, 2005, plaintiff followed up with Dr. Wetherington. She appeared to be doing much better following her surgery, with good strength in her arms.

However, she continued to have hyperpathic[1] pain in her hands that was reduced only with Darvocet[2] and Neurontin.[3]  (Tr. 189).  Plaintiff attended physical therapy in April and May 2005.  After 12 sessions, she reported improvement in pain and range of motion but still experienced numbness, tingling, and sensitivity to ice and vibration. (Tr. 223).

On June 21, 2005, Dr. Wetherington noted that plaintiff's hyperpathic pain was limited to her middle fingers, but it continued to wax and wane.  (Tr. 187).  She also had "a fair amount of discomfort" in her neck.  Her attempt to return to work failed due to decreased tactile sense in her hands.  She continued to take 300 mg. of Neurontin, three times a day, and used 4 to 6 Darvocet each day.  In September 2005, Dr. Wetherington noted that plaintiff's hyperpathic pain continued and opined that "carpal tunnel syndrome on top of her spinal cord injury [might be] diminishing her overall recovery of her central cord syndrome." (Tr. 186).  A nerve conduction study showed findings consistent with bilateral mild carpal tunnel syndrome and a right C-7 nerve root lesion.  (Tr. 140).  In December 2005, Dr. Wetherington noted that plaintiff had increased neck discomfort and was having difficulty turning pages in a book and separating sheets of paper.  (Tr. 184).  CT scans showed the presence of a possible

---

[1]Hyperpathia is an exaggerated subjective response to painful stimuli, with a continuing sensation of pain after the stimulation has ceased.  Stedman's Med. Dict. 853 (27th ed. 2000).

[2]Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain.  It can produce dependence.  See Phys. Desk Ref. 3497 (60th ed. 2006).

[3]Neurontin is sometimes used to treat neuropathy.  http://www.ncbi.nlm.nih. gov/pubmedhealth/PMH0000940/(last visited on Nov. 4, 2014).

pseudarthrosis[4] at C5-C6, which Dr. Wetherington opined could be the cause of plaintiff's generalized neck pain. (Tr. 183). In April 2006, she continued to have some neck pain and worsening pain in her hands. (Tr. 182).

Dr. Wetherington performed a carpal tunnel release on plaintiff's right hand on July 5, 2006. (Tr. 155-56). On September 21, 2006, plaintiff told Dr. Wetherington that she had no improvement in her hand. (Tr. 181). She attended two scheduled physical therapy sessions. (Tr. 228-29). Despite good effort and a home treatment program, she reported no change in her symptoms and continued to experience tightness and sensitivity in her wrist and thumb. She showed some increase in strength in her right hand.

On October 2, 2006, plaintiff saw Chad Shelton, M.D., of Pain Management Services. She reported some improvement of her pain since undergoing carpal tunnel surgery in July 2006, but she still had significant allodynia[5] throughout her fingertips. Dr. Shelton administered a trigger point steroid injection to plaintiff's right wrist and gave her Lidoderm patches. (Tr. 191-95). On May 9, 2007, plaintiff returned to Dr. Shelton, complaining of constant moderate pain in her neck, hand, and arm. (Tr. 266-67). She told Dr. Shelton that the injection brought significant improvement in muscular pain in her hand, but she continued to have diffuse burning and tingling pain, with hyperesthesia,[6] allodynia, and occasional spasm. She had significant cold

_____

[4]Pseudarthrosis is a is a new, false joint arising at the site of an ununited fracture. Stedman's Med. Dict. 1469 (27th ed. 2000).

[5]A condition in which normally nonpainful stimuli evoke pain. Stedman's Med. Dict. 48 (27th ed. 2000).

[6]An abnormal acuteness of sensitivity to touch, pain or other sensory stimuli. Stedman's Med. Dict. 849 (27th ed. 2000).

sensitivity and pain that radiated into her forearm with light touch.  With respect to her neck, she had "some neck pain but [was] overall doing well from a surgical standpoint."  Pain medications gave her some symptomatic control.

Plaintiff underwent pain management treatment with Nehalkumar Modh, M.D., from April 2008 through June 2008, for treatment of pain in her neck and arms, especially her right arm and hand.  (Tr. 311-19).  Dr. Modh noted the presence of allodynia and causalgia[7] in her right arm from her bicep to her fingertips, and decreased cervical range of motion.  She reported minimal improvement with medications.

### III.  Additional Evidence Before the ALJ

### A.  2010 Application Documents

Plaintiff completed a Function Report on September 4, 2010.  (Tr. 513-24). She stated that she got up in the morning to help her son get ready for school.  She then rested on the couch until her pain and dizziness subsided.  She took a shower and, if she felt well enough, did light housework.  She met her son's school bus in the afternoon, helped him with homework, and perhaps prepared a light meal in the microwave or crockpot.  She no longer cooked family meals due to pain in her hands and dizziness upon standing.  She could do light house work and some laundry, but her husband handled most household chores.  She stated that she helped care for her son by getting out his clothes, getting his cereal, turning on his shower and tucking him into bed.  She also helped him with his homework.

---

[7]Persistent severe burning pain, usually following an injury to a peripheral nerve or brachial plexus, accompanied by trophic changes.  Stedman's Med. Dict. 303 (27th ed. 2000).

Plaintiff, who is right-hand dominant, explained that her ability to dress and manage her personal hygiene were affected by her inability to use her right hand.  For instance, she avoided wearing tops with buttons or snaps and shoes that had to be tied.  Due to her dizziness, she did not bathe unless someone was home.  She was able to drive short distances of 10 to 15 miles alone and could shop for food and clothes.  She had the mental, but not the physical, capacity to pay bills and manage bank accounts.  She could not manage cash, however, because nerve damage made it hard for her to handle bills and coins and her pain medications made it hard for her to concentrate on counting.  The only exercise she did was swimming.  She visited at home with family members.  She had difficulties with lifting, bending, standing, reaching, walking, sitting,[8] stair climbing, completing tasks, concentrating, remembering things, following instructions and using her hands.  She explained that she could sit without head support for about 10 minutes.  She experienced pain with standing, walking, and especially reaching.  She could walk a block or less before she needed to rest for about 10 or 15 minutes.  When she was pain-free, she could follow instructions very well, but she did not handle stress or changes in routine well.

## B.  February 6, 2013 Hearing Testimony

Plaintiff testified at the second hearing that she worked as a bank supervisor from 1987 until 2005.  She left her job because she "woke up one day injured and . . . couldn't go to work" after "breaking her neck" while doing housework.  (Tr. 343).  She underwent cervical fusion in February 2005 and had carpal tunnel release surgery on her right arm in June 2007.

---

[8]The ALJ found that plaintiff did not circle the word "sitting" in the list of difficulties.  The court's copy of the document is faint, but there appears to be a partial circle around "sitting."

Plaintiff's husband Samuel Drinnin also testified. (Tr. 346-51). He stated that when plaintiff got up in the morning, she took her medications and, when she was able to, took a shower. She tried to make sure the children got off to school every day. She then rested for a while before trying to do housework, including sweeping, mopping, cleaning the bathroom, and laundry. On a good day, she could work for an hour before she needed to take a break. Three or four days a week, however, she was unable to do much more than rest. Mr. Drinnin testified that he left for work at 7:30 in the morning and came home at lunch time two or three days a week to check on his wife. Often, he found her in bed or lying on the couch; sometimes, she was in tears from the pain.

Mr. Drinnin testified that after plaintiff's initial injury and neck surgery, the pain in her hand subsided somewhat. The surgeon, Dr. Wetherington, told Mr. Drinnin that plaintiff had sustained permanent injury to her spinal cord and that, while she might have some improvement in functioning, she would never be normal again. She experienced excruciating pain and was unable to hold a fork or pencil.

Dolores E. Gonzalez, M. Ed., a vocational expert, testified about the employment opportunities for a hypothetical person with plaintiff's level of education and past work experience, with the ability to lift ten pounds occasionally and less than ten pounds frequently; stand and walk for two hours out of eight and sit for six hours out of eight. In addition, the hypothetical individual could occasionally climb stairs and ramps; could occasionally reach with her right hand; and should avoid concentrated exposure to hazards and unprotected heights. Such an individual was precluded from performing plaintiff's past work but would be able to perform sedentary work, such as a call-out operator and surveillance system monitor, both of which provided a sit-stand option.

If the individual were also limited to less than occasional use of her hands for fine manipulation, she would be precluded from job as a call-out operator but could still work as a surveillance system monitor. An individual who also had to lie down during the work day would be precluded from all employment.

### C. New Medical Evidence

Between April 2009 and June 2010, Solomon Noguera, M.D., treated plaintiff for complaints of dysmetabolic syndrome X, back pain, elevated liver enzymes, hypertension, high cholesterol, depression, and anxiety. (Tr. 529-684). Plaintiff was seen every three months for medication review and evaluation of her conditions.

On April 16, 2009, Dr. Modh ordered radiologic studies of plaintiff's cervical spine to evaluate her complaints of pain in both arms, persisting since neck surgery in February 2005. (Tr. 715-16). The findings indicated possible mild impingements in the cervical region but there were no abnormalities in alignment and no significant changes since an examination completed in September 2005.

Plaintiff returned Dr. Wetherington on July 16, 2009, having last seen him in September 2006. (Tr. 717). She reported that she had undergone multiple injections and treatments for pain in her right arm and neck. She complained of continuing pain with hypersensitivity of the right arm, emanating from the wrist into the upper arm. She was taking several medications for the treatment of pain, including Neurontin,

Methadone,[9] Vicodin,[10] Cymbalta[11] and Meloxicam.[12] On examination, plaintiff had good strength overall with the exception of weakness in the intrinsic muscles of both hands. She had decreased sensation on the right side with patchy, altered, and decreased sensation in the right hand. Nerve conduction studies were consistent with a right C5-C6 neuritis. (Tr. 722). An MRI of the cervical spine disclosed posterior disc protrusions and osteophytes which had become larger since a cervical spine CT completed in March 2007. (Tr. 723-24). On October 6, 2009, plaintiff complained to Dr. Wetherington of a burning sensation that generally radiated from her forearm into her fingers on her right hand, but sometimes radiated up the arm as well. In addition, she had generalized neck pain. Dr. Wetherington proposed that plaintiff undergo nerve root blocks. (Tr. 725).

On November 17, 2009, plaintiff began pain management treatment with Steven Grandberg, M.D. (Tr. 644-45). She described progressively worsening pain in her neck with radiation down her right arm. She also experienced significant allodynia, causing pain when she was touched or wore jewelry on her right hand. Medication,

---

[9]Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers. http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a682134.html (last visited on March 9, 2011).

[10]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[11]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[12]Meloxicam is a nonsteroidal anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. It can also be prescribed to treat ankylosing arthritis. http://www.nlm.nih.gov/medline plus/druginfo/meds/a601242.html (last visited on Nov. 4, 2014).

physical therapy, and epidural steroid injections failed to help.  Dr. Grandberg performed a nerve root steroid injection at that time.  (Tr. 649).  On December 9, 2009, plaintiff reported that her pain and sensitivity continued without relief.  In addition, she had lost fingernails on her right hand.  (Tr. 650-52).  Dr. Grandberg performed a stellate ganglion nerve block.  On January 6, 2010, plaintiff again reported that she received no relief from the procedure.  She received partial relief from her medications which included Meloxicam, Methadone, Neurontin, and Norco.[13]  Dr. Grandberg's assessments included cervical post-laminectomy syndrome, cervical radicular pain, and possible complex regional pain syndrome.  (Tr. 646-48).

On February 23, 2010, plaintiff reported to Dr. Wetherington that the injections provided some relief from neck pain but did not address her arm pain.  (Tr. 726).  Dr. Wetherington proposed a trial of a spinal cord stimulator to treat the pain in her right arm, "which is mostly due to her central cord, spinal cord injury."

On February 24, 2010, plaintiff reported to Dr. Grandberg that she obtained some relief with procedures and medication.  Nonetheless, she continued to experience severe pain in the neck, right arm, and hand.  (Tr. 657-59).  On March 24, 2010, Dr. Grandberg performed another nerve root injection, noting that plaintiff had obtained three to four weeks of good pain relief following the last such injection.  Plaintiff was assessed with cervical post-laminectomy syndrome, adjacent segment disease at C3-C4, cervical radicular pain, and a component of complex regional pain syndrome.  (Tr. 658, 660-63).  On April 14, 2010, plaintiff reported greater pain relief than from prior injections.  (Tr. 664).  On May 12, 2010, plaintiff underwent a translaminar cervical

---

[13]Norco is a combination of hydrocodone and acetaminophen.  See Phys. Desk. Ref. 3188 (63rd ed. 2009).

epidural steroid injection; she received a prescription for Percocet. (Tr. 667-69). She subsequently reported that she received no relief from the treatment and, on May 25, 2010, underwent the procedure again. Dilaudid[14] was substituted for the Perocet, which plaintiff could not tolerate. (Tr. 672-74, 675-76).

On May 26, 2010, plaintiff reported to Dr. Noguera that she had palpitations, concerns about her blood pressure, a lump on her right leg, and had lost finger nails on her right hand. (Tr. 613). On June 22, 2010, plaintiff reported to Dr. Granberg that her pain was severe and constant, describing the pain as shooting, throbbing, miserable and agonizing. (Tr. 676-79). She could not tolerate the Dilaudid or Percocet and reported that Methadone caused changes in her mental status. Dr. Grandberg performed another steroid injection. (Tr. 680-81). On July 7, 2010, plaintiff reported that she had received partial relief from the injection. She was given a prescription for MS Contin.[15] (Tr. 682-84). On September 1, 2010, she reported that she had a little relief, but the MS Contin caused nausea, so she was returned to Methadone. (Tr. 686-88). On October 1, 2010, she complained of dizziness and low blood pressure. She continued to experience constant pain. (Tr. 689-91).

On October 15, 2010, a Physical Residual Functional Capacity Assessment (PRFCA) was completed by Jean Diemer, M.D. (Tr. 692-97). Dr. Diemer concluded that plaintiff could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for less than 2 hours in an 8-hour workday, and sit less than 6 hours in an 8-hour workday. She could occasionally climb ramps or stairs, balance,

---

[14]Dilaudid is a hydrogenated ketone of morphine indicated for management of pain. Phys. Desk. Ref. 2873-74 (65th ed. 2011).

[15]MS Contin is a brand name for morphine.

stoop, crouch or crawl. She was limited in reaching with her right arm in all directions. Dr. Diemer stated that the medical and other evidence were consistent and supported plaintiff's allegations regarding her limitations. She consistently sought treatment and followed recommendations, had multiple injections, and required strong narcotic medications. Dr. Diemer concluded that a work capacity assessment for less than sustained sedentary work was reasonable given plaintiff's persistent pain.

On March 7, 2013, Dr. Wetherington wrote a letter stating:

Mrs. Drinnin sustained a spinal cord injury/central cord syndrome on February 26, 2005. The following day, she underwent urgent cervical spine surgery . . . She subsequently underwent hand surgery for carpal tunnel syndrome that may have been contributing to her continued symptoms. The patient has difficulty with hyperpathic pain in her hands as well as decrease in two-point discrimination and sensory loss. She attempted to return to work after her recovery period but was unable due to continued symptoms related to her spinal cord injury.

I feel that she is unable to perform her regular duties of her job. She has chronic cervical pain, and a decrease in general functionality of her hands due to hyperpathic pain/sensory loss. She needs time (30 minutes three times a day) during the day to lay down and/or alter her position to help relieve her neck pain. I do not feel that she can sit for 6 hours per day, stand for 2 hours per day or lift greater than 15 pounds regularly.

Therefore I believe that she had a permanent disabling injury that began on February 26, 2005.

(Tr. 727).

## IV. The ALJ's Decision

In the decision issued on June 18, 2013, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011.

2. Plaintiff did not engage in substantial gainful activity between her alleged onset date, February 24, 2005, and July 31, 2009.

3. Through July 31, 2009, plaintiff had the following severe impairments: residuals of right carpal tunnel release and cervical laminectomy with radiculopathy.

4.  Through July 31, 2009, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through July 31, 2009, plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a).  She could carry ten pounds of weight occasionally, less than ten pounds frequently, could stand/walk at least two hours total in an eight-hour day, and sit for at least six hours in an eight-hour day.  She had additional postural limitations that are not at issue here.

6.  Plaintiff was not able to perform any past relevant work.

7.  Plaintiff was 39 years old, which is defined as a younger individual, on the alleged onset date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material because using the Medical-Vocational Rules as a framework supports a finding of "not disabled" whether or not plaintiff has transferable job skills.

10.  Through July 31, 2009, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

11.  Plaintiff was not under a disability within the meaning of the Social Security Act at any time from February 24, 2005 through July 31, 2009.

(Tr. 325-32).

## V.  <u>Legal Standards</u>

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002) (<u>quoting</u> <u>Johnson v. Apfel</u>, 240 F.3d 1145,

1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or

mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental

demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The

burden at step four remains with the claimant to prove her RFC and establish that she

cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v.

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745,

750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past

relevant work, the burden shifts at step five to the Commissioner to establish that the

claimant maintains the RFC to perform a significant number of jobs within the national

economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R.

§ 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the

ALJ will find the claimant to be disabled.

## VI.  Discussion

Plaintiff argues that the ALJ's RFC determination is not properly supported by

medical evidence, that the ALJ improperly substituted his lay opinion for the opinions

of Drs. Diemer and Wetherington, and failed to cite the portions of Samuel Drinnin's

testimony that supported her complaints.    She asks the Court to reverse the ALJ's

determination and award benefits for the period from February 24, 2005, through July

1, 2009.

A claimant's RFC is "the most a claimant can still do despite his or her physical

or mental limitations."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal

quotations, alteration and citations omitted).  "The ALJ bears the primary responsibility

for determining a claimant's RFC and because RFC is a medical question, some medical

evidence  must  support  the  determination  of  the  claimant's  RFC."   Id. (citation

omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

### A. Opinions of Dr. Wetherington and Dr. Diemer

In concluding that plaintiff had the RFC to perform sedentary work, the ALJ rejected the opinions of Drs. Diemer and Wetherington that plaintiff was unable to sit for six hours in an eight-hour workday.

Dr. Diemer, the agency consultant, opined that plaintiff could not perform sedentary work, based on a finding that she could not sit for six hours a day due to persistent pain. Although the ALJ gave substantial weight to Dr. Diemer's opinion in all other respects, he concluded Dr. Diemer "probably accidentally" checked the box indicating that plaintiff could sit for less than six hours a day, asserting that there was "no anatomical basis to limit sitting as the result of plaintiff's severe impairments." (Tr. 328). The ALJ's conclusion that Dr. Diemer made a mistake is illogical: Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and "sitting, [though] a certain amount of walking and standing is often necessary in carrying out job duties."

20 C.F.R. § 404.1567(a).  Dr. Diemer found that plaintiff had the capacity to lift up to 10 pounds, satisfying the weight requirement for performing sedentary work.  Thus, the basis for her conclusion that plaintiff could not perform sedentary work had to be her inability to sit for at least 6 hours a day. The ALJ improperly discounted Dr. Diemer's finding that plaintiff suffered from persistent pain that precluded sitting.

Dr. Wetherington was a treating physician.  Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding.  Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012); (citing 20 C.F.R. § 404.1527(c)(2)). Indeed, when the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight.  Id.  "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in original) (internal quotation omitted).  Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).  An ALJ may not substitute his own opinions for the opinions of medical professionals.  Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (ALJ erred in substituting his opinion that plaintiff did not seem depressed at hearing for doctor's assessment of plaintiff's mental health); see also Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (ALJs may not "play doctor"); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ rejected Dr. Wetherington's conclusion that plaintiff could not sit for six hours a day and needed to lie down three times a day, again stating "[t]here is no anatomical basis for any limitations on the ability to sit from a neck surgery and minimal residuals from a carpal tunnel surgery." (Tr. 331). The ALJ improperly substituted his opinion and made independent medical findings.

In rejecting Dr. Wetherington's medical source statement, the ALJ asserted that plaintiff "stated twice in writing that her impairments did not limit her ability to sit in any way." (Tr. 330). This assertion overstates the facts in the record. The ALJ relied on Function Reports completed on October 31, 2006, and September 4, 2010. (Tr. 121, 518). In the 2006 Function Report, plaintiff failed to circle sitting as an ability affected by her condition. However, her Disability Report completed on October 11, 2006, stated that plaintiff was "[v]ery limited in her ability to sit, stand, or walk for more than short periods of time." (Tr. 108). At the 2008 hearing, she testified that she could not sit longer than 10 or 15 minutes unless she was in a chair with a high back so that she could rest her head. (Tr. 33). With respect to the September 2010 Function Report, on the same page the ALJ cites, plaintiff stated that she can only sit without head support for about 10 minutes. (Tr. 518).

The ALJ discredited Dr. Wetherington's opinion because he never documented any limitations on plaintiff's capacity to sit, stand, or walk. (Tr. 331). Dr. Wetherington was not asked to assess plaintiff's capacity to work until 2013 and the absence of such opinions in his earlier treatment notes cannot be used as substantial evidence that she is not disabled. Pate-Fires, 564 F.3d at 943; Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) ("A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional

capacity determination when the doctor was not asked to express an opinion on the matter. . .").

The ALJ also stated that he gave less weight to Dr. Wetherington's 2013 opinion because he had last seen plaintiff in 2010 and because the statement was "back-dated" to 2005, even though he first treated plaintiff in 2006.[16] It is wholly reasonable to decrease the weight given to a physician's opinion when it is based on stale information or appears to be speculative. That is not the situation her, however. Dr. Wetherington cited as the basis for his opinion plaintiff's initial 2005 spinal cord injury and her continued symptoms despite surgical intervention and subsequent treatment. His treatment records are wholly consistent with his 2013 opinion: After her initial surgery, plaintiff continued to complain of hyperpathic pain in her hands and decreased tactile sensation. Dr. Wetherington performed carpal tunnel surgery but this too failed to improve plaintiff's condition. Plaintiff also had "a fair amount of discomfort" in her neck, and Dr. Wetherington noted the presence of a possible pseudarthrosis at C5-C6, which could be the cause of plaintiff's generalized neck pain. (Tr. 183). When plaintiff returned to see Dr. Wetherington in July 2009, she told him that she still had pain in her neck and pain with hypersensitivity in her right arm, despite multiple injections and narcotic medications. (Tr. 717).

Dr. Wetherington's opinion is supported by other evidence in the record. As set out in some detail above, following her carpal tunnel surgery in July 2006, plaintiff participated in physical therapy and sought treatment from two pain management

---

[16]This second assertion is factually incorrect: Dr. Wetherington performed the cervical fusion surgery on February 26, 2005. (Tr. 169-71).

specialists.   Despite  trigger  point  injections  and  medication,  she  continued  to experience allodynia and causalgia.

## 2.  **Testimony of Samuel Drinnin**

The ALJ described the testimony of plaintiff's husband as follows:

> The  claimant's  husband  testified  .  .  .  that  .  .  .  during  the  day,  the claimant  would  get  up,  take  a  shower,  get  dressed,  and  do  some housework,  including  sweeping,  mopping,  laundry,  bathroom  cleaning [and]  some  cooking.   He  testified  that  the  claimant  would  have  to  take a  break  after  completing  some  tasks  before  going  on  to  another.   He stated  that  claimant  would  help  her  children  get  ready  for  school  and make  sure  they  got  on  the  bus.   The  claimant's  husband  testified  that  the claimant  did  have  some  improvement  in  her  pain  after  her  neck  surgery. He stated that the pain in her hands subsided.

Tr. 329.  The ALJ omitted Mr. Drinnin's testimony that plaintiff's condition varied and that on bad days she didn't do much except sleep.  "Bad days" occurred three or four days a week; sometimes, plaintiff had an entire week of such days.  (Tr. 348).  While plaintiff generally made sure the children got to school, there were some mornings she could not get up.  With respect to the impact of her 2005 surgery, Mr. Drinnin testified that the pain in her hand subsided somewhat, but she still experienced excruciating pain when holding a fork or a pencil.  (Tr. 351).

The ALJ improperly substituted his opinion for that of the physicians, improperly failed to give Dr. Wetherington's opinion controlling weight, and selectively considered the testimony of plaintiff's husband regarding her limitations.  Furthermore, he failed to follow the Appeals Council's suggestion that he obtain the testimony of a medical expert to address the issue of onset of disability before August 1, 2009.  The Court finds that the ALJ's determination that plaintiff retained the RFC to perform sedentary work is not based on medical evidence in the record.  Indeed, the medical evidence uniformly indicates that plaintiff has not been able to engage in employment since her

initial injury on February 24, 2005. After careful review of the record, and having given due deference to the ALJ's findings, the court sees see no reason to prolong this case any further. Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability. Pate-Fires, 564 F.3d at 947 (citing Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997), Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir. 1984)). The clear weight of the evidence fully supports a determination plaintiff is disabled within the meaning of the Social Security Act and is entitled to benefits as of February 24, 2005. Accordingly, this matter will be remanded to the Social Security Commissioner for an award of benefits.

## VII.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and **remanded** for an award of benefits for the period from February 24, 2005 through July 31, 2009.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 9th day of January, 2015.